The Sixth Circuit, thanks for braving the cold to get here. We're doing arguments indoors today, which I think everyone is happy about. The clerk may call the first case. Good morning, your honors. The district judge in this case tossed aside plaintiff's scientific evidence that defendant's flea and tick products are absorbed into a pet's bloodstream instead of, as defendants claim, migrating across its skin. In granting summary judgment, the district judge called that evidence a red herring. Here's the irony in that conclusion. In his May 2nd order, he said, quote, The key issue is whether defendant's products truly perform as claimed, namely whether the product, after applied as directed, migrates across the pet's body, a.k.a. translocate, without getting into the animal's bloodstream, which would require FDA approval. So in the end, the district judge disregarded evidence on the very issue that he himself declared the key issue in the case. And to make matters worse, he allowed the defendants to submit purported expert declarations on that issue, but he refused to let plaintiffs depose those declarants. To make matters even worse, then, he adopted... What about the... You know, a lot of people think the federal court litigation would work a lot more smoothly if district court judges were more actively engaged in case management. This was a district court judge who was very actively engaged in case management. And tried to put his finger on what the case was really about. And I think everyone would agree, in fact, I would guess most both lawyers, sets of lawyers in this case would agree, that in the abstract, we need more of that rather than less. So he gets this thing boiled down. At that point, it seems like the defense is the one concerned about how aggressively he's managing the case. But it seems... It doesn't seem. This is what he says. He's trying to avoid discovery for two years and a lot of expense on both sides. So he boils this thing down. He gets a consent to let's get these tests done. And then we'll go with what the tests say. And everyone seems to agree. I mean, it's not you. I think it was Mr. Climaco that agrees to that. And then he follows through on it. He doesn't follow through... He actually doesn't follow through entirely. He does allow some discovery. But I don't know. It just seems like what the whole case is about. Actually, I think, Judge, there's a cutoff point before you get into the summary judgment. Let me explain why I think he didn't follow through at the right time. Because under his plan, it called for... You're agreeing initially he was doing the right things. And you agree that everyone agreed that that approach would work. I mean, they kind of bound themselves to that, including bound themselves in terms of what discovery they'd be entitled to later on. It was silent as to discovery. RE-17 is silent as to discovery. But I take your point. They did agree on what the issue would be that they would explore through these studies. Defendants were to come forward with the studies that substantiated what I just read. But they didn't completely do that. He recognized on August 13th at pages 5 and 6 that they didn't completely do that. And he said right out to Bayer, you didn't show whether imidacloprid, the active ingredient in Advantage, enters the pet's bloodstream. So there's a deficiency on their part. Now, what did he expect of the plaintiffs? He expected the plaintiffs, once defendants came forward with their studies, to refute. He gave some examples of how you do that. So if I'm understanding your first theory of the case, it's even on defendant's terms, even on defendant's view of what happened, even on defendant's view of forfeiture and waiver, the district court judge was still inconsistent. That's your first argument. He was inconsistent because he didn't recognize that the defendants fell short of what he was expecting of them. The plaintiffs did produce the study, scientific evidence, that shows this imidacloprid going into the pet's bloodstream and then being excreted through the urine and everything like that. They did the test. They presented the studies. What did defendants present? Well, at first, defendants didn't say anything about the bloodstream. And then they came back August 31st with Mr. Davis' supplemental declaration in which he said, yeah, it does get into the bloodstream, but it's insignificant. So now we have experts saying the opposite things. One saying it's biologically relevant, not mere trace amounts, and this is how it's working in the bloodstream. Who said that? That is Dr. Jones in the experiment report. And then on the other hand, defendants' supplemental declaration saying, okay, you got us. It does get into the bloodstream, but it's insignificant. So you have the battle of experts there. What does he do? Well, his original order doesn't really speak to what's going to happen in the event of a battle of experts. It just says if the defendants don't have such studies, we're going to go to a neutral lab and do that. Rather than forcing that on the parties, which plaintiffs were all in favor of in the September 4th conference, he tried to get the parties to agree to that, something they'd already agreed to. He tried to get them to agree to that as sort of a settlement. Well, that's not the way to follow through with the May 2nd order. And so what he allowed defendants to do was to squirm out of giving their direct response to the bloodstream scientific evidence that the plaintiffs had presented. Then when it came to September 4th, he said, take two weeks and think about whether you want to agree to this. Plaintiffs come back. They agree to it as they had all along, the neutral. Defendants said no. At that point, the judge had not followed through with his May 2nd order. That was his fault. And then he said, okay, we're back to square one. And that, Judge Sutton, I think, is when he instituted the conventional approach of, okay, we're going to do summary judgment. When you do summary judgment, under ordinary circumstances, it opens up the possibility of discovery again because there hadn't been any. This goes back to your point that the original case management order doesn't say anything about discovery. But it seems to me it's implicit. The whole conversation is about if we do this, we won't need discovery and all this other stuff. So then what he does at this point is consistent with that. Well, it is, except that... The original case management order, get the test done. Of course it's appropriate after the test is done, if the parties can't settle, to do summary judgment. I don't understand what other options did he have. I think he was right to try settlement because I think that's what he thought would happen. Once we have the test, we'll all agree what it says. And that was maybe naive in retrospect. But, okay, so now he calls for summary judgment motions and affidavits. I don't understand why that means everyone now can do full discovery. Well, we're not talking about full discovery. In fact, if all you want to give in this is that Dr. Davis, who was the expert in the supplemental declaration who came forward and said, yes, it does get into the bloodstream, but it's insignificant, doesn't mean anything. If all they got was Dr. Davis' deposition as they requested, I'd be making a different argument. But he didn't give them that. So it wasn't full-blown discovery we're looking for. It was just enough to respond to summary judgment. But let me make one other point, Judge Sutton, because not only did defendants depart from the original plan by refusing to go to the neutral, defendants on page one of their summary judgment expanded to all of their dispersion claims. They said the plaintiffs have no evidence, so genuine issues of material fact, as to all of our dispersion claims. So they expanded it back to the scope of the original claims, all the dispersion claims they made. When they did that, they opened up the opportunity for plaintiffs to refute all of those dispersion claims, including the waterproofness and et cetera. But that was part of the understanding, that all of the dispersion claims were based on the failure to disperse. Right. Not waterproof, not this, not that. So I don't understand that point. Well, they do enter into it, Judge White, because if you track the defendant's theory, and I emphasize, it's a theory. The show paid study says it is thought to be carried by body oil. So if you track their theory, it's carried by body oil, and it gets into the glands, and then the glands constantly replenish. And here's why waterproofness is important, because if the glands are replenishing, waterproofness doesn't matter. It doesn't matter if you wash your pet, if the pet's glands are going to be doing that. Our study disproved that, or at least challenged that. And what we needed to do, as we said in the request for production of documents, we needed to get the documents you had on all of those things, translocation and the bloodstream. I'm sorry. You're saying that your waterproofness claim was based on the theory that even if it was spread across the skin, it still wasn't waterproof. No. Even, well, it is this, Your Honor, if it is spread in the bloodstream, as we say, then it comes out and waterproofness does matter. If it's their theory, their theory is waterproofness doesn't matter. What I don't understand about that is, granted, it seems like you had several different claims that you made in the complaint, but they seem to all get subsumed within the one issue that Judge Polster stated, and that is, does it spread over the body? Without getting into the bloodstream. That's the way he said it. Well, I don't think that was the issue in this case, so tell me why I'm in error, if I am. The advertising here doesn't say that it does or doesn't get in the bloodstream, as I understand it. Actually, Muriel has said that for years. At RE59 Exhibit 4, there's a document that says Muriel has made the claim on its label that this is absorbed, in other words, it is not absorbed systemically, and the EPA comes back and tells them it is absorbed systemically. You should stop saying that. In their website, they say it now, too. We have some examples of what the actual ads were that we looked at in the record, and I didn't see anything in the advertisement that you're complaining about. This is a false advertising case that says whether it did or didn't get in the bloodstream. It says it disperses across the body, so am I wrong on that? It says it disperses across the body, but those two things are inconsistent. Is there any ad that says it gets in the bloodstream? Yes. Excuse me. Is there any ad that says it does not get in the bloodstream? What the ad says is that it is systemically active, which means it gets in the bloodstream, and that's at page ID 140. Wait a minute. If the ad says it is systemic, meaning it gets in the bloodstream, then how can they be false advertising when you claim it does get in the bloodstream? That doesn't make any sense. Yes, because that's what Muriel says. Bayer says that it's wicked all over the surface by the body oil. But stopping right there, I thought the whole point of this was the manufacturer's claim that it wicks across the body. Right. You say, well, it gets into the bloodstream. Right. That all gets subsumed into the single question, as I understood it to be framed here, as to whether there was a good faith belief that the defendants had in this case, based on legitimate studies, that it spreads across the body. Right. The fact that it might also get in the bloodstream in terms of large amounts or small amounts seemed to me to be subsumed within the narrower issue that you had conceded was the dispositive issue in this case. So where am I going wrong there? We acknowledge that the translocation theory that they espouse is incompatible with the bloodstream theory, and they acknowledge that as well. Okay, so I'm trying to understand this question and answer. I think what Judge McKeague is saying is this turns in what came out of the case management order and your client's concession that this is what this case is about. And I thought at that point the issue is does it spread over the top of the pet's body? Yeah, where's the scientific evidence that it spreads over the pet's body? That was it. Right. It had nothing to do with entering bloodstream. Oh, it did. It did. So just tell me, read from the case management conference where it says that. The case management conference has innumerable references to the... So your quick answer to Judge McKeague is both issues were left in play after the case management conference. Both issues. They repeatedly talk about it entering the bloodstream. And Mr. Majores, on behalf of Bayer, said it does not enter the bloodstream. The fact that you repeatedly talked about it entering the bloodstream does not mean that by the end of the case management conference that then gets embodied in the case management order that the single issue that it got distilled down to did or did not include that. You talked about lots of stuff in the case management conference that don't end up being part of the dispositive order. Fair enough, but it did make its way into the order. And here's why it made its... What Judge Sutton is asking you is just read for us if you have it in front of you. What's the key language? And step back and tell us later if you don't have it in front of you. What language in the order do you rely upon? ID 238. The key issue is whether defendant's products truly perform as claimed, namely whether the products, after applied as directed, migrate across the pet's body, a.k.a. translocate, without getting into the animal's bloodstream, which would require FDA approval. That's why Judge Polster spent so much time talking about it in the case management conference, because this is an EPA-regulated product. If it's an EPA-regulated product, the EPA, they say, only regulates products that don't get absorbed into the bloodstream. So there's a disconnect. He recognized there was a disconnect. Got it. So you're reading from the order, right? I did. I read from the order. So he can respond to us why the order does or doesn't mean that. Exactly. Yes, Judge White. Okay. What you're saying is that they're not two separate questions. Right. And that... One's the obverse of the other. What? One is the obverse of the other. They're inconsistent. Right. So it's not that you have a separate claim that it gets into the bloodstream. You are not maintaining that as a separate claim. You're saying, as an evidentiary matter, if it's in the bloodstream, that is evidence that it is not traveling across the skin. That's right. Okay. Now, I know you have Jones saying that it's in the bloodstream. Right. Did you make it clear to the judge that this was not a new argument, that this was your proof that their study was inadequate? Yes. In our submission, we pointed out that their studies did not test for translocation. Their studies tested for efficacy, and that's different. Translocation is the field of pharmacokinetics, how a drug passes through a body. And their studies didn't test for that. You'll notice the Chopate study, and Chopate and his co-authors were Bayer employees, so let's just call it the Bayer study. The Bayer study on 238, I believe it is, says it is assumed, currently thought, that this is passed by body oil. Well, we refuted that with the blood evidence. Mr. DeMarco, just to make sure I'm getting the case management question right in response to Judge McKeague, wasn't the case management order not just what the single issue in the case is, but how we would test that issue? Wasn't there agreement on that? And the thing that I think people are thinking is unfair about your client's approach to this is once you got back the test, and it wasn't the way you were hoping it would go, then we started doing new tests, and let's now start doing new discovery. Am I wrong about that? Yeah, it was exactly the way we hoped it would go, because it showed that it's absorbed into the bloodstream, which is, as I said, incompatible with it wicking across the surface, and that it's excreted back out to the urine. That's a key factor from the Experimore and Dr. Jones' study. He's showing it goes into the bloodstream, and from the bloodstream, it goes back out to the urine and to the skin. That is a contrary theory from what they are espousing. Now, what's the basis of their theory? It's the Chopait study, but it doesn't test for translocation. All it says is it is assumed that it's carried by body oil. That is what we have, Judge Sutton, and I know this court is a stickler for science. What we have is science on the plaintiff's side. They did the blood study. We don't have science in the Chopait report, because it's an assumption. The Chopait report wouldn't even pass Daubert analysis if they tried to get it in, because they themselves say it's an assumption. And then when Dr. Davis comes back and he says, yeah, it does get into the bloodstream, you're right, but it's insignificant, he offers no science to back that up, and that's our complaint. How come when you got their study, why didn't you ask to discover or at least to depose their experts at that point? Why did you wait until the deadline had passed to say you wanted to do that? That is because under the order we were obligated to refute their studies. And what we did in our submission was to say, number one, none of your studies test for translocation, so there's no scientific proof of your translocation theory in your studies, and moreover, our study tends to disprove your translocation theory, because it shows this is blood-borne and blood-excreted. I see that my time is up. I think Judge White may have another question. And Judge Polster made a finding that their submission satisfied their initial burden. Did you object to that? He said that a day after receiving it, but before receiving ours. I can't tell you what standard he was applying, but what I know is when we did our submission on July 31st, we pointed out the ways in which their studies never tested for translocation and in which our study refuted translocation. That's what we were supposed to do, and that's the order in which we did it. If we could have objected sooner, I think it would have derailed the plan. We were living within the plan at that point, and the defendants were. I want to make sure I'm grasping with your view of following Judge Polster's order. Judge Polster was thinking you were going to come back and explain why these studies were defective. You didn't just do that. You got your own experts, and he gets frustrated by that. But I take it one of the things you're arguing today is we can win even by ignoring our own experts. I take it that's one of your arguments. If you look at your experts, things get even better for you is your view, but that gets you back into what the case management order really required and so forth and so on. But I take it part of what you're arguing is, hey, listen, even under the terms of the case management order, follow to a T, ignore our experts, we still show there's a problem. That's right. Okay, no, you don't have to go on. I just want to make sure I'm understanding it. So unless there are other questions, you'll get your full rebuttal. Mr. Kastanis will be quite liberal with time, so don't worry about that. We're just trying to get our questions answered. So thank you, Mr. DeMarco, and Mr. Kastanis, we'll hear from you. Take me just a moment to adjust the podium here and return this to Mr. DeMarco. Thank you. Good morning, and may it please the Court. There are a number of places where I could start this argument. I think the Court appreciates the active case management of Judge Polster, so I think I'll jump in by responding to questions that have been raised about the bloodstream issue. Judge White, my friend told you that the bloodstream issue is the obverse of the translocation issue, and I think I need to correct the science and the record on that because that's not correct. Mariel and Bayer have never said, they have never represented to anyone, that their product does not ever in any way get into a pet's bloodstream. Of course it can. It can get into the bloodstream in any number of ways, and it was even recognized in the earliest EPA reports. In fact, those were relied upon, I believe, by Dr. Jones. The question is not whether it gets into the bloodstream. The question is whether it would work systemically, which means by going into the bloodstream. And if I could just explain what systemically means. That means that a drug gets into your bloodstream like an antibiotic, and you can't just take it once. For example, that's why you have to take antibiotics for 14 days, so that you can get enough of it into your bloodstream so that it will actually work. Now, the representations, and this goes, I think, to Judge McKeague's questions about the Rule 16 order and the bloodstream issue. It is true that Judge Polster, in the May 2nd order, mentions bloodstream, but he is focused on the truth of the two quoted representations, one from Bayer, one from Merrill. And those appear bridging pages 1 and 2 of that order. And those representations say absolutely nothing about whether a product gets into the bloodstream. It only says that it works by what's called, in one case, the term is coined translocation, and the other is just moving across the skin. That's exactly what Judge Polster's order goes to, because he says at the end that whether the detection of some product in the bloodstream is irrelevant to the question of whether it works by translocation. And then he says, too, the plaintiff's evidence that small amounts of product may be in the blood doesn't prove that defendant's dispersion claims are wrong. That's the adverse argument that he's making. Well, that actually refutes the adverse argument. Right. But even from your perspective, if you look at what the plaintiff's experts show, is there any evidence in this record, whether you agree with it or not, is a different question, that says that if it does get into the bloodstream in large or small amounts, that therefore that means it can't or doesn't work by translocation? In other words, that one excludes the other. No, I don't see anything like that. So that may have been the assumption, the working assumption that Dr. Jones made. I'm not asking you to assume anything. I'm just asking you, in the record, are you aware of any place where the plaintiff's experts say that? Well, I think the answer is no, and let me back up and answer why the answer should be no. If you look at what Judge Polster told the plaintiffs repeatedly, he said, plaintiffs, you need to show me, after Bayer and Marial produced their studies, and he found them, that on their face they sustained the written claims that he set out in that May 2nd order. Once he said that, and once he said that the face of those studies, show paid, and in our case the Dyke dissertation, which is a lengthy document, support the representations, then the plaintiffs were obligated to come forward with expert, scientific evidence. The term scientific was used at the case management conference, and he clarified that with the word expert in one of his later orders after the 5-2 order. And he reminded them, after they sought more time to put in their testing, that he believed that they were not doing what they were supposed to be doing, which was actually addressing the Bayer and Marial studies, not putting forth a separate study that comes up with some different conclusion. Well, in fact, that study did not come up with a different conclusion, and I'll get to that in a moment. But let me go to the Jones Declaration, or the Jones Report, because that's the only place where you could plausibly say that the plaintiffs tried to satisfy their burden, as agreed to, and as set forth by Judge Polster, of coming forward with scientific, expert evidence. And if you go to pages, I believe it's six and seven, of the Jones Report, it's docket number 35, Exhibit 4, and then there's an amended version of it, which does not materially differ for purposes of this argument. At docket number 59, Exhibit 2, it's attached to their response to our summary judgment motion. At pages six and seven, Jones lists out a number of bullet points. These bullet points are the only place where they ever, through an expert, attempted to say anything at all about the Bayer and Muriel studies. Everything that my friend talked to you about in his argument this morning was attorney argument, which was unsupported by any citation, not even, incidentally, to the Jones Report. That was strictly attorney argument in their summary judgment response, docket number 59. So I can walk you through each of these bullets and show you why these do not satisfy the burden that Judge Polster put out for them. To start, these bullets are in a section of his report that purport not to say that the Bayer and Muriel reports are wrong, that they're fraudulent, false, inadequate, unreliable for purposes of these representations. Those pages of the Jones Report simply purport to show why his study with Experimur was superior to the studies that Judge Polster required us to submit that satisfied our burden. Is it the docket number again that you're looking at? Well, it depends on which one you want to look at. The most recent one is docket number 59, Exhibit 2. I want to look at the one you're talking about. 59-2. That will follow along with the one that I have. Because if you gave us the consecutive page ID number, it's a lot easier for us to find things. Sure. I'm sorry about that, Your Honor. So talk about the bullet points. Respond to the key ones he's using. Well, I'm not sure which ones exactly he's using. I think he's not really separating them out. So, for example, in the first bullet, Jones says, the Bayer and Muriel studies were performed by the interested parties themselves, conducted by their own employed scientists. You know, I must tell you on that point, there's a little bit something to their complaint. It is a funny case management approach that says, okay, here's what we'll do. This is a false statement case. We'll figure out if it was really true, and we'll let the defendant do the studies, and then we can all agree. We can either just settle the case after we've seen the studies, because we can all agree for better or worse, or you can file something just responding to the studies. I mean, no. I think your obvious answer to that is, well, you agreed to it in the case management order, so you have no right to complain. But it is a funny argument to them. I know. I know. I know. You're the ones that didn't want this. But it is still funny that this is how it all played out, that the way I, a district court judge, am going to figure this out is I'm going to have the defendants do their own studies and complain to us if you don't like it. The defendants were not required, in fact, were not allowed to do their own studies. We had to produce an existing study within the time frame that existed. Yeah. Okay. So I guess that's good in one sense, but bad in another. It's defendants in control of prior studies they've done. I don't know. I think it completely eased their case, because they were the ones who had to make a prima facie case, and Judge Polster relieved them of that burden and put the initial burden on us. The more strange part of the process is they put up their reports that substantiate their claims. That makes some sense to me. Then there's no discovery. I mean, that seems like a really odd way to manage a case. But for the fact, they agreed. That's your argument. Well, that's right. They agreed, and we were the ones who advocated. Not only did they not agree, but they advocated, don't do all this discovery. Right. There's an important point to keep in mind, and I think Judge White brought it out in her questioning of my friend on the other side. And that is, as my friend said, docket entry number 17 said nothing about discovery. So it was their desire to, I think, I don't want to put my words in their brains, but I do think that their desire was to try to resolve this case quickly, get a settlement, and be on their merry way. And it didn't work out that the proofs supported that. But there was nothing in that case management ruling that forbade them asking for discovery. In fact, I will confess that our counsel were quite surprised that on May 3rd, or May 16th rather, after we had submitted our studies and they'd been found acceptable by the court, that we weren't served with discovery requests. But they didn't do that. So under this court's case law, the timeliness there, they had the opportunity to take discovery absolutely. And in the summary judgment stage, they in fact did get some limited discovery. Let's go back to the Jones report because that distracted you a little bit. That's okay. I want to make sure to get through all of these. So we start with the first one, and the first bullet is an observation that the Bayer and Marial studies were performed by the interested parties themselves, conducted by their unemployed scientists. I'm going to put aside for purposes of this because it's summary judgment that that statement isn't in fact true. The Dyck study was an independent graduate student, and two of the six authors of the Chopin study were not Bayer employees. But that said, what does this tell us? It tells us a factual observation. It doesn't follow that by saying, and therefore it's unreliable, and therefore they have cooked the numbers that they reported. They didn't do that. We move on to bullet two. The observation is made, there was no quantitative measurement of Fipronil and Marial exhibit B, which is the Dyck study, or imidacloprid in Bayer exhibits B, C, D, E, F, and G. By the way, that's excluding Bayer exhibit A, which is the Chopin study that you've heard about before. He then goes on to say, however visualization of radioactive compound in the blood venules within the dermis, hair follicles, and sebaceous glands. By the way, the blood venules, that's the tube. That's not inside the vein. He says it's observed from a picture in one of those articles on the face of it. That's his comment on Chopin. Again, I'm going to put aside the fact that there in fact was quantitative measurement. Certainly at pages 108 and 109 of the Dyck dissertation. But in any event, this suffers from the same problem. It's an observation. It doesn't give an expert conclusion that, and therefore, these studies are inadequate, incomplete, false, or fraudulent. That was the burden that they assumed with enthusiastic agreement from the initial case management conference. Let me move on to bullet number three. Again, keep in mind that the whole point of this section of bullets is to show why his study is better than the Bayer and Marial studies. Not, importantly, that the Bayer and Marial studies were inadequate, incomplete, false, or fraudulent. Bullet three. He says that his study was approximately 200 times more sensitive than the sensitivity in Bayer Exhibit B for permethrin. Of course, that's only one of the Bayer exhibits. Jones even points out that that study failed to mention imidacloprid at all. Again, an observation. But in fact, a more sensitive study, his, would have picked up more translocation, not less.  as we put forth in the brief. Let's move on to bullet five in the Jones report. Jones tells us that he used a different breed of dog, a Bichon Frise, a little dog, instead of the standard laboratory test dog, which is a beagle, which was what was used in these other studies. He justifies this choice because of an observation in Bayer Exhibit A, that's the Chopaid report again, or the Chopaid article, that, quote, the mechanism of action for the dermal location and distribution of these agents in dogs has yet to be fully characterized. Now, my friend has relied on that statement a fair amount by saying that they don't know how it works. And to say that it has yet to be fully characterized is not to say that we're just making translocation up. Quite the contrary. There are still questions to be answered at the time of the Chopaid article, and that's a basic scientific observation. But again, sensitivity of the dog breed, as the EPA report that he relies on shows, this has to do with adverse events, things like rashes, things like skin irritations that qualify as other than rashes. And they point out, and he goes so far as to say, the lack of a sensitive breed and use of the beagle was a limitation in Mariel Exhibit A and Bayer Exhibits A, B, C, D, E, F, and G. A limitation. How was that a limitation? To what end? In a study of translocation. He doesn't go that far. That's the ultimate in conclusory expert opinion, and even if it were supported, I'm not sure that statement would show a genuine dispute of material fact here. It certainly wouldn't show the inadequate, incomplete, false, or fraudulence of the Bayer and Mariel tests. Just a basic question which maybe has, I hope, a simple answer. Judge Polster obviously thought his case management order meant that what the plaintiff's burden was was once you produced these studies, it was their job to attack them to show why they didn't work. And if they didn't work, you'd go from there. And he seemed to assume that didn't mean hiring your own experts to do their own studies. But does the case management order really say that? Is there something in the case management order that makes it clear that plaintiffs could not respond to your studies by doing their own studies and using those studies to show how this can't be right? I don't think it does, but I think that's the important point, that this study doesn't do that. All it does is it effectively, except for the bullets that I'm walking the court through here, completely ignores the Bayer and Mariel studies. Can I just follow up? The point I'm making is you can create a material issue of fact by having two sets of studies. I mean, if your study doesn't proceed along the lines of attacking every single thing the defendant's study did, it's still possible to create a material issue of fact. I don't think that's what any of the orders here anticipated, because as Judge Polster pointed out... That was the point of my question. Then I perhaps understand it better now, Your Honor. So as Judge Polster repeatedly pointed out, the question was whether Bayer and Mariel had studies that gave them a basis for making these assertions in their packaging, the assertions that are in the 5-2, the May 2nd order at pages 1 and 2. He said repeatedly that the consequence of failing to disprove that would be five times he said it in the May... That proves it can't be a knowing false statement. That's the point. I'm sorry? That proves it can't be a knowing false statement. Right. That's exactly right. And so that's what he decides is the issue. Yes, Judge White. Well, initially I don't think he put it in terms of a good faith statement. It was either true or false, right? It was either a study that shows it's true or not. Well, I don't think that's quite right. I think he said that there had to be a basis for the assertions. And I think you see him saying that there was a basis for the assertions. I think you see him saying that there was a good faith basis for the assertions. But all that said is that what he's really trying to do is get down to brass tacks here. Okay. I don't see why you're making assertions that it spreads across the skin. Their position is that it doesn't. You come up with a study that shows its presence all across the skin. They come up with an expert who says, look, those studies really don't show that it's spread across the skin. It just shows that it's spread. That it's spread, not how it's spread. And I've done a study that shows that it definitely spreads throughout the blood system. And we don't get measurements on the skin that you would expect if it was spreading across the skin. And therefore, as an expert, I conclude that the most likely explanation for how this is happening is that it's spreading systemically and not across the skin. And I think it's very hard to tease that out of the Jones report here. And I think if I can go through the rest of the bullets, that will help to answer your question. But I'm happy to answer if you have a specific part of it you'd like to point me to. Are you saying that the Jones study doesn't say what I just said? I don't read it as saying that. I read it as saying that I've done some tests, and I think that my tests show this. The problem is that, of course, the facts of his tests, the tables that are set forth at, I believe, pages 10 and 11, if I remember correctly, of the Jones report, show, in fact, that it is moving across the skin. At five minutes, at an hour, at 24 hours. And remember that against best practices, Dr. Jones and Experimer have tied up these dogs for the first 24 hours, and they can't move. And it has actually spread, the table shows, tip to tail. All you have in his report, the best they have, are absolutely conclusory. And we know that conclusory expert testimony does not sustain one's burden on summary judgment. The best that you could say for them is that they have conclusory expert evidence. Did Judge Solster analyze the Jones report? I think he did. He was given the Jones report, actually the initial one, when they purported to meet their burden, and then he gave it again at the summary judgment stage. I mean, I don't see how someone can look at these two reports and come to the conclusion that Jones doesn't cast doubt on the conclusion that it's spreading across the skin by a process that is spreading across the skin, not into the blood and then coming out. Well, I think, actually, I disagree with that because I think that the only place where he does that, he does that in completely conclusory, unsupported-by-any-reasons form. But beyond that, Judge White, I think you have to come back to what the burden was under the case management order. It was to show not that I have a different study, but to show that the Baer and Marial studies were inadequate, incomplete, false, or fraudulent. And where in the Baer study or the Marial study is it established that it's passing through a process along the skin and not through the bloodstream? Well, I will first answer by telling you that that is exactly what Judge Polster found and found that that satisfied our initial burden. Well, I know he said it, but I don't see where he analyzes it. But that said, if you look, for example, at the clinical relevance box on the first page of Chopaid, it says that the test, quote, demonstrated the migration of the radioactivity, because remember, the substance is radioactively tagged so they can track the movement across the skin, from the application sites to distal areas of the canine hair coat and skin. That is exactly what the claim is. That is, it is moving across the hair coat and the skin. The Dyke dissertation, which is a quite lengthy dissertation, contains that same conclusion, having used fluorescence as the tag for the substance. But that doesn't tell you how it's moving, does it? I'm not sure that if you're using radioactivity and fluorescence in order to track at one hour, two hours, three hours, and to watch it spread across the skin from the place where it was applied, and it eventually reaches the tail. I'm not sure how that doesn't meet our burden of showing translocation. In fact, I think that demonstrates it pretty darn conclusively. Of course, we shouldn't have had the initial burden in this case. We assumed it, accepted it, and all that. I'm asking, how does that study establish that? Does that study also show that it's not being dispersed through the bloodstream? I don't think either study looked to that specific question, but it would be impossible for any substance to be applied to the skin and move through the bloodstream and back up through the skin in that fast a way. That's, again, where I started by trying to give you a little explanation about what systemic means, and that's why we take antibiotics for 14 days instead of just one shot. Although I guess they've now come up with some of those that supposedly work. Okay, and you have an expert saying that? We were put to the initial burden of showing existing studies that supported our advertising representations. We didn't have an expert except for... Well, actually, we did put forth experts, but that wasn't ever our burden. Our burden was to put forth the studies. Their burden was to refute the studies. They didn't do it. Now, I can come back to the only places where they even tried to mention the Bayer and Muriel studies, but my answers on the rest of the bullets with regard to the Bayer and Muriel studies are going to be the same, and that is that the Jones report offers observations, but not anything that is actually even remotely close to sustaining the burden of showing... According to the order, the question was falsity, not knowing falsity? According to the order, the question was whether the studies the defendants had supported their claim that this drug worked by translocation across the top of the skin. So the issue then becomes you meet your burden, and I think everyone agrees you met your initial burden the way the order worked, of showing that was true with these studies. But what I'm curious about, I just want to make sure I'm grasping a really basic point here, is that as Judge Polster saw it, the question was whether your studies, whether it was a falsity, because the plaintiffs could come back and say, well, you said this, but that's not true. Here's why those studies don't support the claim, or is the question knowing falsity? So I think that's enlightened. The understanding of the May 2nd order is enlightened both by the conference that preceded it as well as the orders and conferences that followed it. And there's another aspect of the case that the court may have picked up in at least looking at the transcript of the May 1st argument, in that there was a reference to a Dannon case. This was one of the reasons why the plaintiffs advocated so strongly to get the MDL panel to put the case before Judge Polster. Well, in the Dannon case, as we understand it, the judge followed a very similar procedure, and that procedure yielded a settlement, some changes in the representations that were made, and the attorneys got some fees in that case. And so what both Mr. Climaco, who I guess was involved in that case and was very knowledgeable about it as well as Judge Polster, were trying to get at was something similar to the Dannon case. And in fact, if you look at page 58 of the May 1st transcript, Mr. Climaco says, referring to the Dannon case, that that issue was clinically and scientifically proven, and you presented the same challenge to the Dannon defendants that you presented here, and we said if they could substantiate it, we'd walk away. And that's really sort of how we got to this case management order, was that Judge Polster had a previous experience following a similar procedure. It had yielded successful results. It has nothing to do with knowing falsities, it's just whether it's true or not. Well, I think that what you— Just my very basic common sense question, which I think has a quick answer, I just don't know it right off the top of my head, is it's funny to tag someone with false representations when they actually have something supporting what they're saying, that it turns out after the fact someone can prove might not be true. But that's not normally thought of as a false representation because the state of mind of the individual was, hey, here's our studies that show it, this is what we thought we were advertising, here's why we thought we were advertising it. Hey, in light of your studies, maybe going forward we need to rethink this. This is a retroactive claim. And that's where I'm trying to get to the May 1st and the later orders, because I think those inform you that Judge Polster, even though he might have not used the term scienter or he might not have used the term intent in the May 2nd order that followed the May 1st conference, that's clearly what he meant. And it's certainly what he said he meant both in the May 1st conference because it had to do with whether we had a basis for making the assertions. Isn't that demonstrated by the fact that it's a retrospective looking where you go back and look to see if there were studies that backed up the statements made at the time? Exactly. Even though current studies may theoretically show that those studies were wrong and in fact the representations were false, but they weren't believed to be false at the time. Exactly. If that's the way you think about the case, this isn't about Dalbert and how careful Jones was or was not and how much he substantiated or didn't substantiate. It's whether the defendant's studies gave a reason for this representation. And if they gave a reason for the representation, the other side's burden is to show no, no, no, no, that's ridiculous. It said this, but you knew that wasn't true, and here's why. Which is a very different inquiry from an inquiry over who's right about this. Well, Judge Sutton, we would be in violent agreement with that view of the case, and certainly that's the way that we have briefed the case in our red brief in this case. But what I wanted to make sure was that the court did not think that in adopting this, I think the term that we used at the time of it was an unconventional procedure, but was ultimately a very active case management procedure. In narrowing the issues under his Rule 16 power to a single issue, which is this representation and this representation supported by these studies, and finding that they failed to rebut that. And what I wanted to try to do by walking through the Jones report was to answer the remaining questions that you might have about the state of the record in answering that question. I totally get it. We appreciate it. And I think, thank you. Thank you for your time. And I think what I'm going to do is give Mr. DeMarco seven minutes of rebuttal to start, and if that runs out and you frown at me aggressively or violently to borrow a term, we'll think about it. And if I could just add one last point, Judge Sutton. With very few depending clauses. Fifteen seconds. The claims about the waterproofing and all of that, those were already out of the case at the 813 conference because of the case management order. And the judge was just trying to find a way that some change could be made and the settlement could be accomplished without going down the road that we're ultimately on. Thank you. Thank you for answering our questions. We appreciate it. Mr. DeMarco. So we'll set it for seven minutes, and then we'll just see if there's still questions. We've got a few other cases today, too. Thank you, Your Honor. Can I just ask you about this last thing I was saying? I mean, if you're thinking about it in two different ways, again, maybe you have just a real quick reason to get me off of this. So when you have battles of experts, one way of thinking about it is who's right. What's really going on here? And I'm just wondering if that's a part of the way you've argued it. But I'm just wondering if it's fair to look at what Judge Polster was doing. Okay, wait, let's just find out if they have studies supporting these statements. They produced these studies supporting these statements. And I'm just wondering if you have two burdens. Burden one is to show those studies actually don't support the statements, and so you couldn't possibly say this in light of the studies. Or if the studies do support the statements, they're effectively fraud, because how can you possibly rely on that given how sloppy and so forth they are? Because I think you're arguing the case as if it gets to a jury if you've got something that undermines the validity of the study. But I think the question is, does it undermine their reason for relying on the study and disrepresentation as to how the drug worked? I think it does. And let me start off with the Chopate study itself, because that's the study that Bayer would have been relying upon for saying that imidacloprid translocates. But you're agreeing with my framing of the issue. It's a knowing falsity. No, I do not. It's not just a falsity. I do not agree with that point, because we are here under any number of states' garden variety consumer protection laws, and those are about falsity. They're not about knowing falsity. Those are about making misleading or deceptive statements. So those laws apply when someone makes a representation, and their representation, they have a study, an internal study that supports exactly what they're saying. They can be tagged after the fact for false representation? After the fact. If it turns out that study is not true, if they make a representation as to the characteristics of their product. Not that they can't be challenged. If they do a flawed study or rely incorrectly on information in a study, yes, under state consumer protection laws, they have mischaracterized the characteristics of their product, and they can be held liable. It is, and it's liable not just for falsity, but it's for deceptive, misleading misrepresentations. So to the extent Judge Polster picked the word substantiate. I read your studies as saying, okay, fine, this thing migrates across the top of the skin. It maybe does work that way, but we can show it also works by going into the system. Right. How is that necessarily, I don't understand what kind of a false representation is that when it still does migrate across the top of the skin. You're just showing it does both. Well, we're showing, first of all, this is what CHOPADE, their study, says about the mechanism of distribution across the skin. First of all, it says the exact mechanism, and I'm skipping some words, of distribution of imidacloprid in canine skin still remains subject of interest for further investigations. So they didn't test for the mechanism of distribution. So if Bayer then went forward and said, hey, here's how it distributes over the skin, it translocates. This study does not support that. So we come back, and in portions that he read you, Dr. Jones says, hey, that study didn't test for translocation, the way you're describing it. It didn't test for that. And furthermore, we did test our bloodborne theory. And to go back to something that Judge White pointed out, here's what Dr. Jones said happens. Systemic absorption into the bloodstream of fipronil and imidacloprid was demonstrated along with, these are key words, excretion into the urine, hair, sebaceous, sebum layer of the skin surface. So what Dr. Jones believes he's proving with this is, you all didn't even test for this. I tested for this, and what I found is it gets absorbed into the blood and then excreted back to where you are finding it in the hair and the skin, after the blood, from the blood, and you're taking credit for this wicking process. That's wrong. And so he's saying, I have better evidence. You didn't test for it at all. So I think, Judge Sutton, we're in a position where the plaintiffs have the better of the scientific evidence here. Now, to come back to your original point about deception. What would have been your theory of the case management order if they had not been able to produce prior studies? They just didn't have them. Or what they had were studies that just didn't bear on the question, but then after they produced that, they said, or maybe best of all for you, a study that actually supports your theory of the case. Let's think about it that way. So a study that supports your theory of the case, they say after producing that study, but, Your Honor, this was done a while ago. We really don't think it had its eye on the ball. We want to do our own studies on this. Right. What would your view of the case management order have been with respect to that request by the defendants? They could or could not produce those, create and then produce those studies in terms of deciding what happens in summary. I'll give you my honest reading of the order. It did not. They could or could not. It did not say if there's a tie that he breaks the tie. It says if they can't produce studies substantiating their translocation, their self-dispersion, then it goes to the neutral. It didn't say what happens in the event. My hypothetical is the study helps you. All they have is two studies and on balance they help you. They say let us do a new study because we think it will show we're right. Would you? My answer is the same. It doesn't speak to that. The case management order would have allowed them to create new studies at that point in time substantiating their theory of the case? I think what the case management order trips off of is their failure to substantiate. So under your hypothetical, if they failed to substantiate their studies, it didn't matter what the plaintiffs did, whether the plaintiffs came forward with, hey, here's a 1990 study that you did that actually substantiates our bloodborne. Under the case management order, that would have gone to the neutral. So they could have produced new studies at that point under your view of the case management order? A neutral would have produced the study, yes, and they would have been bound by it. Everybody would have been bound by the neutral, but they in the end rejected the neutral. I'm just trying to give you the reading of the case management because I think when you take a careful look at it, some of the scenarios you're laying out just aren't addressed in there. But to get to one other point that they made in terms of good faith basis, we have to come back to the case management order. If we're going to live with it, we have to live with it. But it says substantiate. It does not say good faith basis. It does not say subjective belief or anything like that. And substantiate to us means to prove. And that's what Dr. Jones was talking about in his report when he pointed out that they didn't test for translocation. Now, he was fair because he says... If it's good faith belief, do you lose? If it's good faith belief? I don't even think we lose on that because the showpaid study says this is yet to be tested. So they are espousing a theory of translocation that they don't have a study to back up. Showpaid doesn't back it up. Showpaid says it's thought to be by body oils. That's not scientific. Now, Dr. Davis comes back and he tries to clean that up by saying, here's how it operates and it doesn't go through the blood and all the blood stuff is insignificant, but he doesn't cite any science at that point. I think that's a key point. I think we've gone... Is there any last killer point you want to make? Let me see if there's anything that I absolutely need to say. I did want to point out, in response to Judge White's questions, paragraphs 14 and 15 of the Jones report get at exactly what you were talking about, why he thought the blood evidence was so compelling and disproved. Remember, the last line of the Jones report is that the self-dispersion claim is disproven by his data. Thank you very much, Mr. DiMarco and Mr. Castanis. Thanks so much for excellent briefs in the case, excellent oral arguments for listening to and answering our questions. We really appreciate it and we're going to work through the case. Thank you. Thank you very much. The case will be submitted. The court may call the next case.